UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOHN H. HERTEL,

                            Plaintiff,

                      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                            Defendant.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**

15−CV−00833

PAMELA K. CHEN, United States District Judge:

Plaintiff John H. Hertel ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The parties have cross-moved for judgment on the pleadings. (Dkts. 16, 18.) Plaintiff seeks reversal of the Acting Commissioner of Social Security's ("Commissioner") decision and award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmance of the denial of Plaintiff's claims. For the reasons set forth below, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's motion.

## BACKGROUND

### A.    Procedural History

Plaintiff filed applications for DIB and SSI on March 21, 2011.[1] (Tr. 126.) Plaintiff claimed disability beginning on September 1, 2010, due to diabetes, arthritis, and high blood

---

[1] The Court notes that although the ALJ refers to March 21, 2011 as the date of Plaintiff's SSI and DIB applications, (Tr. 126), the "Application Summaries" for Plaintiff's SSI and DIB applications refer to April 11, 2011 as the date Plaintiff applied. (Tr. 238, 245.) "Tr." refers to

pressure. (Tr. 147, 149.) On June 6, 2011, the SSA denied Plaintiff's claims for both. (Tr. 143-50.) Plaintiff requested a hearing before an administrative law judge ("ALJ") on July 13, 2011. (Tr. 155-57.) ALJ Lori Romeo held a hearing on September 12, 2012, where Plaintiff testified in the presence of his attorney. (Tr. 62-112.) However, because Plaintiff's counsel submitted additional medical evidence shortly before the hearing, the ALJ postponed the vocational expert testimony until she could read and analyze the new evidence. (Tr. 126.)

A second hearing was held on July 29, 2013, where Plaintiff was again represented by counsel and where a vocational expert testified. (Tr. 24-59.) By decision dated September 27, 2013, the ALJ denied Plaintiff's DIB and SSI claims, finding that Plaintiff was not disabled. (Tr. 123-136.) After the decision was issued, Plaintiff submitted an additional questionnaire by Plaintiff's primary treating physician, Dr. John Costa, among other supplemental information. (Tr. 473-81.) However, the Appeals Council concluded that the questionnaire and supplemental evidence did not provide a basis to change the ALJ's decision. (Tr. 2.) On December 30, 2014, the Appeals Council denied Plaintiff's request for review, and the ALJ decision became final. (Tr. 1-7.) Plaintiff filed this action on March 19, 2015 seeking review of the ALJ's decision. (Dkt. 1.)

### B.    Non-Medical Evidence:  Plaintiff's Self-Reporting and Testimony

Plaintiff was born on June 29, 1959 and was 51 years old at the onset of his alleged disability. (Tr. 278.) Plaintiff reported his highest level of education to be ninth grade. (Tr. 272.) In the years leading up to his alleged onset of disability, Plaintiff held multiple driving-related jobs. (Tr. 313.) From 2006 to 2007, Plaintiff worked as a driver for Builders for Family and Youth. (*Id.*) For an unspecified period of time, Plaintiff worked as a driver for Perimo Towing

---

the Administrative Transcript.    Page references are to the continuous pagination of the Administrative Transcript supplied by the Commissioner.

and for Carnazza Plumbing. (*Id.*) And from May 25, 2010 through August 16, 2010, Plaintiff was employed as a recycler for Irving Rubber and Metal Company ("Irving Rubber"). (*Id.*; *see also* Tr. 264.) According to a letter submitted by Irving Rubber, Plaintiff was terminated in August 2010 because of unspecified illnesses. (Tr. 264.)

*September 12, 2012 ALJ Hearing*. Plaintiff testified that Irving Rubber fired him because his blood sugar would often drop at work, after which he needed time to recover, and that he ended up passing out once. (Tr. 72.) Plaintiff explained that his job consisted of picking up car batteries and scrap metal and placing them into a machine that crushes them. (Tr. 88.) His blood sugar would drop when he exerted too much energy, and he would feel extremely weak, such that he needed to sit down. (Tr. 89.)

Plaintiff further testified that for the previous one-and-a-half to two years, his legs would feel like "they're on fire and [they're] being poked with a hot iron," if he remained standing for too long. (Tr. 79-80.) After this pain began, Plaintiff would have to sit down; however, once he sat for approximately ten minutes, his legs would feel numb from his hips to his knees and he would have to stand again to relieve this pain. (Tr. 79.) Thus, when playing pool or solitaire on the computer, Plaintiff stated that he needed to get up and walk around every five or ten minutes. (Tr. 88.) And when driving, Plaintiff had to pull over every couple of minutes, get out of his car, and stand up. (Tr. 85.) Plaintiff testified that he needed to pull over three times in the course of driving to the ALJ hearing, which is a 45-minute drive from his home. (Tr. 85-86.) Plaintiff also claimed that he could not walk more than five to ten minutes without needing to take a break. (*Id.*)

Plaintiff also testified that about every two days, his left elbow acted up and prevented him from picking up and pushing items. (Tr. 82.) Similarly, Plaintiff stated that the arthritis in his hands prevented him from lifting more than five to ten pounds or from making a fist and opening

his hands completely. (Tr. 83-84.) As an example, Plaintiff stated that he had a hard time picking up a container of milk or orange juice in the mornings. (Tr. 84.) When asked by the ALJ, Plaintiff stated that he could still pick up a coin from the table with either hand, use buttons and zippers, and dress himself. (Tr. 84.) Plaintiff also testified that sometimes with medication, the arthritis would improve, though sometimes it worsened. (Tr. 84.) He noted that "every now and then," he'll use marijuana for his hands, which he felt "works better than the medicine." (Tr. 86.)

Since his last job, Plaintiff has lived with his mother, who has also been supporting him financially. (Tr. 87.) Plaintiff's activities on a "typical day" consist of waking up, taking a shower, taking his medicine, eating breakfast, watching television, and reading books. (Tr. 85.) In Plaintiff's daily life, his sugar levels range anywhere from as high as 250-475 to as low as in the 40s. (Tr. 90.) Plaintiff stated that he has no problem with his vision despite a diagnosis of diabetic retinopathy, except that he needs glasses to read. (Tr. 98.)

The ALJ asked Plaintiff at one point to address his representation to the Department of Labor that he was "ready, willing, and able to work" as a tow truck operator in September 2010, and expressed concerns about Plaintiff's credibility and apparent willingness to make misrepresentations to receive benefits. (Tr. 104, 106.) Plaintiff explained that he made this September 2010 representation because "back then . . . I wasn't sure I could work but I wanted to try it." (Tr. 107.)

***July 29, 2013 Supplemental ALJ Hearing.*** At the second hearing, the ALJ questioned Plaintiff on when the numbness in his lower extremities began to affect his functioning, and when he began experiencing bilateral numbness in his hands, pointing out the dearth of such information in his primary care physician's treatment notes. (Tr. 34-35, 38-40) However, most of the hearing was devoted to the vocational expert's ("VE") opinions as to whether jobs existed in the national

economy for an individual of the claimant's age, education, work experience, and Residual Functional Capacity ("RFC"). (Tr. 135.)

The VE first noted that Plaintiff had held three types of jobs in the preceding fifteen years: delivery route driver, tow truck driver, and salvager. (Tr. 42.) The ALJ posed a hypothetical of an individual of Plaintiff's age, education, and work experience, possessing an RFC to perform light work with a sit/stand option at will, except he must also avoid exposure to respiratory irritants. (Tr. 44.) The VE noted that none of the three identified previous jobs would be available to such an individual. (*Id.*) In particular, the VE noted that although the delivery route driving occupation would offer a sit/stand option, the option to sit or stand would not be at Plaintiff's will. (*Id.*) Instead, the VE noted that under the Dictionary of Occupational Titles ("DOT"),[2] the following three occupations would be available to the individual in the hypothetical posed: a photocopy machine operator, an office helper, and an information clerk. (Tr. 44-45.) The VE explained, however, that because the DOT "does not go into specifics in regards to sit and stand" options, her assessment in that regard came from her own observation of these jobs and also her education and training. (Tr. 46.)

### C.    Medical Evidence

#### 1.    Treating Physician (Dr. John Costa)

***Treatment Notes.*** Plaintiff first started seeing Dr. Costa, his primary care physician, on May 18, 2007. (Tr. 412, 473.) Dr. Costa specializes in internal and pulmonary medicine. (Tr.

---

[2] The DOT is an extensive listing of jobs and job descriptions prepared by the United States Department of Labor. The DOT gives each job type a specific code—for example, "295.467–026 Automobile Rental Clerk"—and establishes, among other things, the minimum skill level (*e.g.*, "unskilled," "semi-skilled," and "skilled") and physical exertion capacity (*e.g.*, "sedentary," "light," "medium," "heavy," etc.) required to perform that job. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012).

480.) At the first visit, Dr. Costa diagnosed Plaintiff with Type I diabetes, hypertension, decreased thyroid function, and high cholesterol. (Tr. 412.) Records of the next few visits show elevated glucose levels, but no other abnormalities. For instance, on November 20, 2008, a urinalysis test revealed a 2+ glucose level. (*Id.*) And on February 24, 2010, Dr. Costa noted that Plaintiff's glucose level was 416, but that he had eaten canned fruit with syrup prior to his visit. (Tr. 413.)

On October 11, 2010, Plaintiff's first visit after his alleged onset of disability, Dr. Costa administered a flu shot and noted only that "[patient] feels well today." (Tr. 469.) At a February 24, 2011 visit, Dr. Costa noted that a pulmonary function test revealed a "mild restriction." (Tr. 469.) No other abnormalities were noted at that time. (*Id.*) Plaintiff visited Dr. Costa again on April 26, 2011, at which time Dr. Costa noted for the first time under the category of "extremities" that Plaintiff reported experiencing numbness in both feet. (Tr. 396.) No other abnormalities were noted, and Plaintiff was instructed to return in two months. (*Id.*) Dr. Costa's notes for a July 21, 2011 visit and a November 15, 2011 visit do not mention numbness under "extremities" or note any other abnormalities generally. (Tr. 465, 468.) Dr. Costa's January 13, 2012 notes indicate that the doctor prescribed Xanax for Plaintiff's anxiety, and that Plaintiff reported feeling well otherwise. (Tr. 464.) Similarly, no abnormalities were noted on February 9, 2012. (*Id.*) Dr. Costa examined Plaintiff again on April 12, 2012, where he noted that a pulmonary function test revealed "moderate restrictions" and that Plaintiff's glucose level was at 221. (Tr. 379.)

On May 7, 2012, Dr. Costa recorded Plaintiff's reports of experiencing numbness in his thighs and both feet, but Dr. Costa noted that both feet were warm and had good color. (Tr. 391.) Dr. Costa started Plaintiff on Neurontin (neuropathy medication) on this date. (*Id.*) Plaintiff visited Dr. Costa again on June 11, 2012, after banging his toe. (Tr. 370.) Dr. Costa provided Plaintiff with recovery instructions but noted that Plaintiff's feet were warm and had good color.

(*Id.*) On July 30, 2012, Dr. Costa instructed Plaintiff to continue with Neurontin and return in two months or as needed; no abnormalities were noted. (Tr. 466-67.) On October 10, 2012, Plaintiff visited Dr. Costa for another flu shot, at which time Dr. Costa found that Plaintiff's glucose levels were elevated to 326. (Tr. 463.) No other abnormalities were noted. (*Id.*) Plaintiff's visit to Dr. Costa on May 20, 2013 showed no abnormalities under "extremities," (Tr. 462), though Dr. Costa noted numbness in Plaintiff's feet during his July 16, 2013 visit. (Tr. 461.)

*Two Opinion Notes.* On November 15, 2011, Dr. Costa wrote a brief note stating that Plaintiff "has severe diabetic neuropathy of the lower extremities and is unable to walk or stand on his feet for long periods of time." (Tr. 329.) "Because of this," he concluded, Plaintiff was "not a candidate for employment" and was disabled. (*Id.*) And in a note dated December 14, 2012, Dr. Costa stated: "[Plaintiff] has juvenile-onset diabetes suffers from disabling neuropathy of the feet and hands. This restricts his ability to work. I do not believe he can work and I believe he is disabled by the diabetic neuropathy." (Tr. 432.)

*Multiple Impairment Questionnaire.* On December 4, 2013—after the ALJ decision issued—Dr. Costa completed a retrospective Multiple Impairment Questionnaire regarding Plaintiff's health. (Tr. 473-80.) In the questionnaire, Dr. Costa diagnosed Plaintiff with severe peripheral neuropathy of the feet and hands, osteoarthritis of the knees and hands and wrists, and asthma. (Tr. 473.) His prognosis of Plaintiff was "poor," and that he was "not likely to improve with time or treatment." (*Id.*) Dr. Costa stated that Plaintiff was unable to stand on his feet and walk steadily, and that he experienced pain in his hands and wrists when clutching heavy objects. (*Id.*) Dr. Costa further noted that Plaintiff experienced fluctuations of glucose with frequent episodes of hypoglycemia, as well as shortness of breath with mild to moderate exertion. (*Id.*)

Dr. Costa pointed out that Plaintiff consistently had elevated levels of cholesterol and glucose, with glucose readings commonly exceeded 250. (Tr. 474.) Dr. Costa noted that Plaintiff's primary symptoms were "numbness and pain in feet," "numbness in hands," and "cough, wheezing, fatigue on activity." (*Id.*) Plaintiff's pain is described as 9/10, "constant" and "unrelenting," precipitated by movement and weight-bearing, though present even at rest and on medication. (Tr. 475.) Dr. Costa estimated that these symptoms and limitations dated back to January 2011. (Tr. 479.)

Dr. Costa opined that Plaintiff could not sit for more than four hours in an eight-hour workday and needed to be able to get up and move around every fifteen minutes. (Tr. 475.) Dr. Costa also opined that Plaintiff could not stand or walk for more than one hour at a time. (*Id.*) He assessed that Plaintiff could carry up to five pounds frequently, and up to 20 pounds occasionally. (Tr. 476.) He further assessed that Plaintiff has significant limitations in performing repetitive actions due to his pain and numbness, and as a result, Plaintiff has marked limitations in using both hands for all manipulative functions. (Tr. 476-77.) He stated that Plaintiff's pain and other symptoms would likely worsen in a competitive work environment, as well as constantly interfere with his attention and concentration. (Tr. 477-78.) He also estimated that Plaintiff would need to take unscheduled breaks every 15-30 minutes, for 15-20 minutes at a time, and that Plaintiff would likely be absent from work more than three times a month. (Tr. 478-79.) Dr. Costa also believed that Plaintiff could not push, pull, kneel, bend or stoop and had limited vision, and that he needed to avoid dust. (Tr. 479.)

### 2. Non-Treating Physicians

***Dr. Leonard Pace.*** On April 5, 2011, Plaintiff visited Neuro-Rehabilitation Specialist Dr. Pace for an initial neurological consultation after experiencing numbness in the right side of his

face and right thigh and being referred by Dr. Costa. (Tr. 355-57.) The Court finds this record to be largely illegible.

**Dr. Jerome Caiati.** On May 27, 2011, approximately nine months after Plaintiff's alleged onset of disability, Dr. Caiati performed a consultative internal medicine examination of Plaintiff at the Commissioner's request. (Tr. 320-23.) Dr. Caiati reported that Plaintiff appeared to be in no acute distress, his gait and stance were normal, he could walk on heels and toes without difficulty, and he could perform a full squat. (*Id.*) Additionally, Plaintiff used no assistive devices, needed no help changing for the examination or getting on and off the examination table, and could rise from a chair without difficulty. (*Id.*) Dr. Caiati noted that Plaintiff suffered from no musculoskeletal, neurologic, or extremity abnormalities, and that Plaintiff's hand and finger dexterity was intact with a 5/5 grip and 5/5 pinch bilaterally in all fingers to thumbs. (Tr. 322.) Dr. Caiati diagnosed Plaintiff with hypertension, diabetes, hyperlipidemia, while also noting Plaintiff's prior history of an unspecified thyroid diagnosis, anxiety, substance abuse, and traumatic amputation of the right fourth distal phalanx in 1996. (*Id.*) He recommended that Plaintiff would benefit from psychiatric or psychological evaluations. (Tr. 323.)

Dr. Caiati concluded that Plaintiff was "unrestricted" in sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, and bending. (Tr. 323)

**Dr. Hurley Knott.** On April 11, 2012, Dr. Knott, a State agency medical consultant, reviewed Plaintiff's medical evidence of record and concluded that Plaintiff had no physical limitations. (Tr. 330.) He assessed that Plaintiff had no restrictions for sitting, standing, walking reaching, pushing, pulling, lifting, climbing, and bending. (*Id.*)

**Dr. Vinod Thukral**. On August 8, 2012, Dr. Thukral performed a consultative internal medicine examination of Plaintiff at the Commissioner's request. (Tr. 335-40.) Dr. Thukral noted

that Plaintiff reported experiencing 8/10 left knee pain for the previous three years, which was "sharp and intermittent," and precipitated by standing for a long time, bending, and lifting. (Tr. 335.) Plaintiff also reported experiencing 10/10 bilateral hand pain for the previous five years, which was also "sharp and intermittent," and precipitated by gripping and lifting. (*Id.*) Plaintiff complained of bilateral upper and lower extremity cramps and numbness for the previous two years due to diabetic neuropathy, though he denied any other complications from neuropathy. (Tr. 336.) His glucose level the day of his visit was 245. (Tr. 335.) Dr. Thukral noted that while Plaintiff reported having asthma since 2002, he had no history of requiring an emergency room visit, hospital admission, intubation, or steroid dependence due to asthma. (Tr. 336.)

Plaintiff reported to Dr. Thukral that he could not cook, clean, or do laundry or shopping due to his bilateral lower extremity cramps and numbness from the neuropathy. (Tr. 337.) Dr. Thukral noted Plaintiff had decreased visual acuity in both eyes and advised Plaintiff to see an ophthalmologist as soon as possible. (Tr. 337.) Dr. Thukral also noted a high blood pressure of 180/90 and referred him to the emergency room for uncontrolled hypertension. (Tr. 337.)

Dr. Thukral also reported, however, that Plaintiff appeared to be in no acute distress, his gait and stance were normal, he could walk on heels and toes without difficulty, and he could perform a full squat. (Tr. 337.) Ultimately, Dr. Thukral concluded that Plaintiff has "no limitation for sitting, but has mild to moderate limitations for standing (for a long time), bending, pulling, pushing, lifting, carrying, and any other such related activities due to diabetic neuropathy." (Tr. 339.) Dr. Thukral also concluded that Plaintiff needed to avoid smoke, dust, or other respiratory irritants due to his asthma history. (Tr. 339.)

***Dr. Jeffrey M. Dacher.*** On June 12, 2012, Dr. Jeffrey M. Dacher, a podiatrist, examined Plaintiff for a toe injury. (Tr. 435.) The Court finds his records to be illegible.

***Dr. Arbab Khan.*** On March 13, 2014, following the ALJ decision, Dr. Khan took X-rays of Plaintiff's shoulders because Plaintiff was experiencing bilateral shoulder pain.  (Tr. 8.)

## DISCUSSION

### A.    Standard of Review

In reviewing a denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") to claimants under the Social Security Act (the "Act"), federal district courts must determine "whether the SSA's decision was supported by substantial evidence and based on a proper legal standard."  *Clark v. Comm'r of Soc. Sec.*, 143, F.3d 115, 118 (2d Cir. 1998).  The term "substantial" does not require that the evidence be overwhelming, but rather that the evidence must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  In determining whether the Commissioner's findings were based on substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which contradictory inferences can be drawn."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  A district court's role in reviewing the Commissioner's final decision is limited, because "it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  *Clark*, 143 F.3d at 118; *Pogozelski v. Barnhart*, No. 03-CV-2914, 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004).  Thus, so long as "the [ALJ] applied the correct legal standard" and "the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on the court."  *Petre v. Comm'r of Soc. Sec.*, No. 13-CV-2657, 2015 WL 6971212, at *3 (E.D.N.Y. Nov. 20, 2015) (quoting *Pogozelski*, 2004 WL 1146059, at *9).

## B.      Eligibility Standard for Social Security Disability Benefits

In order to be found eligible for DIB and SSI benefits, claimants must be disabled as defined by the Act.  Claimants are disabled under the meaning of the Act when they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The claimant must prove that the impairment is "of such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).  However, the ALJ does have an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009).  This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities or if the reports do not contain all necessary information or if those reports lack medically acceptable clinic and laboratory diagnostic techniques.  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal citations omitted).  First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the answer is in the affirmative, the claimant is not disabled.  If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is determined to be severe

when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(c), 416.920(a)(c).  If the impairment is not severe, then the claimant is not disabled within the meaning of the Act.  However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings").  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act.  On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five.  The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the answer is in the affirmative, the claimant is not disabled.  Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the answer is in the affirmative, the claimant is not disabled.  However, if not, the claimant is disabled and is entitled to benefits.  *Id.*

## C.    The ALJ's Decision

On September 27, 2013, the ALJ issued a decision denying Plaintiff's claims.  (Tr. 126-36).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since

the alleged onset date of September 1, 2010. (Tr. 128.) At step two, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus, thyroid disease, arthritis, asthma, and neuropathy. (*Id.*) At step three, the ALJ found that these impairments or a combination of these impairments did not meet or equal the listed impairments under the Listings. (Tr. 128-29.) In reaching this conclusion, the ALJ found that Plaintiff had only "mild impairments" in activities of daily functioning, social functioning, and concentration, persistence, or pace. (Tr. 129.) The ALJ found no evidence of any episodes of decompensation. (*Id.*)

The ALJ next concluded that Plaintiff possessed the RFC to perform light work, except that Plaintiff would need an at-will sit/stand option because of effects from arthritis and bilateral foot neuropathy and must avoid concentrated exposure to dust, smoke, and other respiratory irritants because of his asthma. (Tr. 130.) In making this RFC determination, the ALJ relied heavily on Dr. Caiati's May 2011 consultative opinion and Dr. Thukral's August 2011 consultative opinion. (Tr. 131, 133.) However, the ALJ also relied heavily on the regular, contemporaneous treatment records of Plaintiff's treating physician, Dr. Costa, from May 2007 to 2013, which largely showed an absence of complaints except for a few instances of reported lower extremity numbness; the ALJ accordingly discounted two opinions from Dr. Costa, in which he opined that Plaintiff was not a candidate for employment. (Tr. 132-34.) The ALJ did not find Dr. Costa's opinion notes well supported or consistent with either his own treatment notes for Plaintiff for the same period or with the consultative examiners' evaluations. (Tr. 133.) The ALJ further noted that Dr. Costa was not a specialist or familiar with the disability program. (Tr. 132-33.)

The ALJ also disregarded as not credible Plaintiff's own statements concerning the seriousness of his condition, in part because in or about September 2010 to in or about 2011, Plaintiff stated that he was ready, willing, and able to work to the New York State Department of

Labor in order to be eligible for unemployment benefits. (Tr. 132.) Although noting that receiving unemployment benefits does not necessarily preclude a Plaintiff from receiving disability benefits, the ALJ found that Plaintiff's assertions under oath of his willingness and ability to work during this period detract from Plaintiff's credibility regarding the seriousness of his condition. (*Id.*)

The ALJ concluded at step four that in light of this RFC, Plaintiff was unable to perform any of his past relevant work, which all required at least medium exertional levels for employment as a delivery route driver, truck driver, and salvager. (Tr. 134.) However, at step five, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (*Id.*) The ALJ relied on the Medical Vocational Guidelines and the testimony of a vocational expert in determining that Plaintiff could perform work as a photocopy machine operator, office helper, or informational clerk. (Tr. 135.) The ALJ concluded at the end of the five-step inquiry that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.*) Therefore, Plaintiff was not disabled and the ALJ denied his claims for benefits. (*Id.*)

On appeal, the Appeals Council determined that certain evidence submitted after the ALJ's September 27, 2013, decision was not contrary to the weight of evidence in the record. (Tr. 2.) Therefore, the Appeals Council found no basis for changing the ALJ's decision. (*Id.*)

### D. Analysis

Plaintiff's primary argument before this Court is that the ALJ erroneously failed to accord Dr. Costa's opinions significant weight in arriving at the conclusion that Plaintiff retains a functional capacity for light work, while giving the consultative examiners' opinions unwarranted

weight. (Dkt. 18 ("Pl.'s Br.") at ECF 8-9.[3]) Plaintiff further argues that at step five, the ALJ improperly relied on the VE's testimony because the VE "offered no specific support for his testimony that the three occupations he cited allow the worker to sit or stand at will." (Pl.'s Br. at ECF 10-11.) The Commissioner argues that the ALJ applied the correct legal standards and that the SSA's decision must be affirmed. The Court agrees with the Commissioner.

### 1. The ALJ's RFC Determination Is Supported By Substantial Evidence

In determining a claimant's RFC, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a claimant's subjective symptoms. *See* 20 C.F.R. §§ 404.1545, 416.945; *Alston v. Colvin*, No. 14-cv-0244, 2015 WL 5178158, at *14 (E.D.N.Y. Sept. 3, 2015). The ALJ is required to provide "a narrative discussion describing how the evidence supports each conclusion" and to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered or resolved." Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *7 (July 2, 1996).

Here, the ALJ determined that Plaintiff had the RFC to perform light work,[4] with an at-will sit/stand option, because of effects from arthritis and bilateral foot neuropathy, and that Plaintiff also had to avoid concentrated exposure to dust, smoke, and other respiratory irritants because of his asthma. (Tr. 130.) The ALJ expressly relied on two medical opinions to determine Plaintiff's RFC: (1) Dr. Caiati's May 2011 consultative examination of Plaintiff, finding that

---

[3] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the documents internal pagination.

[4] The Social Security regulatory scheme divides work activities into five categories, in ascending order of exertional demands: sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567; 416.967. Light work involves minimally strenuous lifting and carrying of no more than 10 pounds on a frequent basis, and no more than 20 pounds at any time, with limited pushing, pulling, and bending. 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10 ("the full range of light work requires standing, off and on, for approximately 6 hours of an 8 hour workday").

Plaintiff had no physical restrictions; and (2) Dr. Thukral's August 2012 consultative examination, noting that Plaintiff was unable to stand for long periods of time and had a history of asthma. (Tr. 133.) The ALJ explained that she could not give Dr. Costa's November 2011 and December 2012 notes significant weight because his opinions were not well supported or consistent with the bulk of the evidence, including his own contemporaneous treatment notes and the consultative examiners' findings. (*Id.*)

### a) The ALJ Properly Applied The Treating Physician Rule

Plaintiff first argues that the ALJ failed to accord Dr. Costa's opinions and treatment records proper weight. In two opinion notes dated November 2011 and December 2012, Dr. Costa noted that Plaintiff was unable to walk or stand on his feet for long periods of time. (Tr. 329, 387, 432.) In both, Dr. Costa opined that Plaintiff was unable to work and was disabled. (*Id.*)

"The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010) (citation omitted); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the opinion of the treating physician "is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)). The report of a consultative physician may constitute such substantial evidence. *Mongeur v. Heckler,* 722 F.2d 1033, 1039 (2d Cir. 1983).

An ALJ who declines to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. §§ 404.1527(d)(2), 404.927(d)(2). "Among those factors are: (i) the frequency of

examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion [*e.g.*, the treater's understanding of the SSA's disability program]." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Id.; accord* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503-04 (2d Cir. 1998) (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

As an initial matter, here, the ALJ did not discount Dr. Costa's opinions in their entirety. Indeed, the ALJ credited and incorporated into her RFC Dr. Costa's assessment that Plaintiff was unable to walk or stand on his feet for periods of time, by allowing for an at-will sit/stand option so that Plaintiff could rest his feet when needed. (Tr. 132, 134.) Similarly, the ALJ's RFC determination incorporated Dr. Costa's finding that Plaintiff suffered mild to moderate respiratory restrictions by acknowledging Plaintiff's need to avoid exposure to dust, smoke, and other respiratory irritants. (Tr. 130.) Ultimately, however, the ALJ determined that despite the fact that Dr. Costa had been Plaintiff's treating physician since 2007, Dr. Costa's opinions as to Plaintiff's inability to work were inconsistent with his own treatment notes. (Tr. 133.) For example, the ALJ observed that Dr. Costa's treatment notes, spanning six years between May 2007 and July 2013, show that he had consistently assessed Plaintiff to be within normal limits and to be without

abnormalities in his extremities, with the exception of some lower extremity numbness.[5]  (Tr. 133; *see supra* pp. 6-7.)  The ALJ moreover properly noted that Dr. Costa was neither a specialist in the area of diabetic neuropathy nor familiar with the disability program.[6]  (*Id.*)  *See Halloran*, 362 F.3d at 32.

The ALJ also noted that Dr. Costa's medical opinions were inconsistent with the findings by consultative examiners Dr. Caiati and Dr. Thukral.  Both Dr. Caiati and Dr. Thukral stated that Plaintiff's strength and sensation were normal, his gait and stance were normal, that he could walk on his heels and toes without difficulty, and that he used no assistive devices.  (Tr. 321-22, 337-38.)  Dr. Caiati examined Plaintiff nine months after his alleged onset date of disability, but found that Plaintiff was completely unrestricted in all exertional or postural activities—*i.e.*, sitting, standing, walking, reaching, pushing, pulling, lifting, climbing, and bending.  (Tr. 323.)  The ALJ noted that Dr. Caiati's opinion was supported by thorough physical examination findings and was consistent with both Dr. Costa's and Dr. Pace's medical opinions and notes from the same time period—including the fact that there was no indication that Plaintiff had suffered any of the more serious symptoms associated with diabetes, such as end organ disease, neuropathy causing any loss of motor function or impairments in gait or station, or acidosis or retinitus.  (Tr. 132-33, 391.)  The ALJ noted that, indeed, Plaintiff had not yet been prescribed medication for diabetic neuropathy at the time of Dr. Caiati's evaluation.

---

[5] Indeed, this Court notes that over the course of the six years of records provided to the SSA from Dr. Costa, Dr. Costa noted only three instances of lower extremity numbness on Plaintiff's part:  April 26, 2011 (Tr. 396), May 7, 2012 (Tr. 391), and July 16, 2013 (Tr. 461).

[6] Dr. Costa's conclusion that Plaintiff "is disabled from work" is not a medical determination, rather, it is a determination reserved for the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  *See also Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.") (internal quotation marks omitted).  As a result, Dr. Costa's conclusions that Plaintiff could not work were not entitled to any special deference under the regulations.  (Tr. 133.)

The Court finds that the ALJ further properly accounted for changes in Plaintiff's condition following Dr. Caitai's examination in mid-2011 by according significant weight to Dr. Thukral's consultative examination 14 months later, in August 2012. (Tr. 133.) Dr. Thukral found that Plaintiff experienced mild to moderate limitations in standing for long periods of time because of foot numbness and neuropathy. (Tr. 339.) The ALJ found that this assessment was again supported by contemporaneous records, since by this time, Plaintiff had repeatedly reported episodes of numbness to Dr. Costa and had been placed on Neurontin for his diabetic neuropathy. (Tr. 131, 133; Tr. 391, 396.) The ALJ rejected, however, Dr. Thukral's assessment of limitations for bending, pulling, pushing, lifting, and carrying, noting that she found no support of these limitations in Dr. Costa's treatment notes for the same period of time. Finally, the ALJ found Dr. Thukral's conclusion that Plaintiff needed to avoid, smoke, dust, and other respiratory irritants to be consistent with Dr. Costa's medical assessment. (Tr. 133, 339.)

### b) New Evidence Submitted to Appeals Council Does Not Provide a Basis to Change the ALJ's Decision

Following the ALJ decision, Plaintiff submitted three more pieces of additional evidence: (i) a one-page note from Dr. Marvin Wertenthel indicating that Plaintiff had diabetic retinopathy (Tr. 470); (ii) a retrospective questionnaire completed by Dr. Costa covering the January 2011 to December 2013 time period (Tr. 473-80); and (iii) a March 13, 2014 X-ray of Plaintiff's shoulders (Tr. 8). While new evidence submitted to the Appeals Council after an ALJ decision becomes part of the administrative record, *see Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996), the Appeals Council only considers new evidence if: (1) the evidence is material, (2) the evidence relates to the period on or before the ALJ's hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence. *Rutkowski*

*v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010) (citation omitted); *see also* 20 C.F.R. §§ 404.970(b), 416.1470(b).

The Court first finds that the Appeals Council properly disregarded the March 2014 shoulder X-ray as not relating to the relevant time period. As to Dr. Wertenthel's note indicating that Plaintiff had diabetic retinopathy, the Court finds that this record would not change the ALJ's findings or conclusions as the ALJ was already aware of this diagnosis based on Plaintiff's testimony, but had noted that, functionally, Plaintiff was nevertheless able to read, use the computer, and even drive. (Tr. 88, 98, 132.)

As to Dr. Costa's retrospective questionnaire, the Court similarly finds that the Appeals Council correctly concluded that the questionnaire did not provide a basis to change the ALJ's findings or conclusions. As with his two previous opinion notes, Dr. Costa's highly restrictive assessment were inconsistent with his own contemporaneous treatment notes throughout the relevant period, as well as the opinions of the two consultative examiners during the same time frame. Moreover, to the extent that Dr. Costa's opinion was based on numbness in Plaintiff's legs and feet, and Plaintiff's inability to sit or stand for too long, the ALJ had already fully accounted for those limitations in the RFC determination by incorporating an at-will sit/stand criterion.

### c)  Substantial Evidence Supports the ALJ's Credibility Finding

Although not raised by Plaintiff, this Court finds that the ALJ properly assessed Plaintiff's credibility when determining Plaintiff's RFC. (Tr. 132.) While an ALJ "is required to take the claimant's reports of pain and other limitations into account," he or she is "not require[d] to accept the claimant's subjective complaints without question." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). Rather, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of

the degree of impairment." *Tejada v. Apfel,* 167 F.3d 770, 776 (2d Cir. 1999) (internal citation omitted). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (collecting cases). Thus, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420 (citation omitted). "If the [Commissioner's] findings are supported by substantial evidence . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the claimant does suffer from such an impairment, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b); *see also* 20 C.F.R. § 404.1529(a). Here, the ALJ found first that Plaintiff's "medically determinable impairments . . . may well cause some symptoms and some limitations to standing and walking and the need to avoid respiratory irritants." (Tr. 130-31.) However, the ALJ concluded at the second step that Plaintiff's "statements concerning the intensity, persistence and

limiting effects of pain are not entirely supported by or consistent with the overall thrust of the medical and nonmedical evidence of record." (Tr. 131.)

This Court finds that the ALJ's credibility determination is supported by substantial evidence. The ALJ noted that despite alleging disability as of September 2010, Plaintiff did not begin taking medication for diabetic neuropathy (Neurontin) until a year and a half later, in May 2012. (Tr. 131, 133; *see* Tr. 391.) Moreover, the ALJ noted that on the first recorded visit to Dr. Costa following the alleged onset date, on October 11, 2010, Plaintiff told Dr. Costa he was feeling well. (Tr. 131, 411.) Plaintiff told Dr. Costa he was feeling well at a subsequent visit on January 13, 2012, when he obtained a refill on Xanax. (Tr. 131, 464.) The ALJ also properly considered Plaintiff's self-reported wide-ranging activities of daily living. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); SSR 96-7p, 1996 WL 374186 at *3 (July 2, 1996). Plaintiff noted that he was able to dress, travel, and drive independently. (Tr. 132.) Additionally, despite Plaintiff's asserted anxiety disorder, Plaintiff testified that he was able to go to bars to socialize with friends, drink, and buy marijuana, which suggests that his anxiety disorder caused only mild limitations. (*Id.*) Moreover, despite testifying that he had diabetic retinopathy, Plaintiff testified that he was able to read, watch television, play games on his computer, and drive. (*Id.*)

The Court finds that the ALJ also properly considered Plaintiff's statements that, for the period in or about September 2010 to in or about 2011, he told the New York State Department of Labor he was ready, willing, and able to work and collected unemployment benefits. (*Id.*) While noting that receipt of unemployment benefits alone does not disqualify a person from receiving disability benefits, the ALJ reasoned that Plaintiff's assertions under oath of "his willingness and ability to work during this period" go to Plaintiff's credibility "regarding the seriousness of his condition." (*Id.*) Once Plaintiff admitted that his statements to New York State had not been

entirely truthful, it was fair for the ALJ to take them into consideration when determining his credibility. *See, e.g.*, *Luzarraga v. Colvin*, No. 13-cv-4778, 2015 WL 1321665, at *8 (E.D.N.Y. Mar. 24, 2015) ("Courts in the Second Circuit have determined 'that an ALJ may consider evidence that the claimant received unemployment benefits and/or certified that he was ready, willing, and able to work during the time period for which he claims disability benefits as adverse factors in the ALJ's credibility determination.'") (quoting *Felix v. Astrue*, No. 11-cv-3697, 2012 WL 3043203, at *10 (E.D.N.Y. July 24, 2012)).

Accordingly, the Court finds that there was substantial evidence in the record supporting the conclusion that Plaintiff was still capable of performing light work with an at-will sit/stand option, notwithstanding Plaintiff's self-reported evidence and testimony to the contrary.

### 2.    The ALJ Properly Relied on the Vocational Expert's Testimony

In response to the hypothetical posed by the ALJ—of a claimant of Plaintiff's age, education, and work experience, possessing an RFC to perform light work with a sit/stand option at will, who must avoid exposure to respiratory irritants (Tr. 44)—the VE identified three examples of occupations that would be available to such an individual: a photocopy machine operator, an office helper, and an information clerk. The VE testified that there are approximately 6,000 photocopy machine operator jobs in the regional economy and 66,000 in the national economy; approximately 9,000 office helper jobs in the regional economy and 83,000 in the national economy; and approximately 80,000 information clerk jobs in the regional economy and 900,000 in the national economy. (Tr. 44-45.) The VE largely based these determinations on the position descriptions in the DOT. The VE explained, however, that because the DOT "does not go into specifics in regards to sit and stand" options, her assessment of jobs fitting that criteria came from her own observation of these jobs and also her education and training. (Tr. 46.) Plaintiff argues

that the ALJ erred in allowing the VE to rely on personal experience and observations to recommend appropriate jobs for Plaintiff. (Pl.'s Br. at ECF 10-11.) The Court finds that this was not legal error.

At step five, the disability having been shown, "the burden . . . shifts to the [Commissioner] to prove . . . that the claimant is capable of working."[7] *Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005) (citations omitted). The ALJ must consider a claimant's RFC coupled with his age, education, and work experience to determine whether the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). An ALJ may rely on a VE's testimony regarding a hypothetical as long as "there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion" and accurately reflect the limitations and capabilities of the claimant involved. *Id.* (citations omitted); *see also Salmini*, 371 F. App'x at 114; *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

The hypothetical presented to the VE here closely tracked the ALJ's RFC assessment made at Step Four of the analysis. The ALJ also specifically found that the VE's testimony and findings were consistent with the information contained in the DOT, as required under SSR-004p. (Tr. 44-45, 135.) While Plaintiff is correct that the DOT does not go into specifics regarding a sit/stand option for these specific occupations, the VE testified that her opinion was based on her

---

[7] "Once a disability claimant proves that his severe impairment prevents him from performing his past work at step four, the Commissioner then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Salmini*, 371 F. App'x at 112 (citations and quotations omitted).

"vocational experience in conducting job analyses and observing jobs at work as well as [his] education and training." (Tr. 46.) The ALJ then determined that a finding of "not disabled" is appropriate in this case because Plaintiff's RFC was for light work and the three representative occupations suggested by the VE matched his exertional capabilities and existed in substantial numbers in the national economy. (Tr. 135.)

Plaintiff disagreed with the ALJ's VE determinations because he believes that the three occupations enumerated by the VE "require manual dexterity and manual endurance" and that these occupations "appear to require substantial standing and walking." (Pl.'s Br. at ECF 11.) However, Plaintiff's arguments are unconvincing because the VE explained that the tasks involved in these three occupations would allow for a chair or stool to be in reach, and that most responsibilities would include lifting small items such as a ream of paper, printer trays, sorting mail, and filing documents. (Tr. 47-53.) Since even Dr. Costa's medical notes suggest that he can lift up to 20 pounds, and because Plaintiff would be able to sit or stand at will and avoid respiratory irritants, the VE's determinations adequately take into consideration Plaintiff's physical limitations. (Tr. 476.) Plaintiff also testified at the hearing that "the copy machine ink would kick off an asthma attack," implying that any job that required photo copying would not meet his RFC limitation of avoiding respiratory irritants. (Tr. 52.) In her decision, however, the ALJ noted that even if that job were eliminated, there were two other sample jobs. (Tr. 135 n.10.)

Accordingly, the VE's identification of jobs that Plaintiff could perform, existing in substantial numbers in the national and local economies, provides substantial evidence supporting the ALJ's determination that Plaintiff was not disabled within the meaning of the Act.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's motion is GRANTED. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court AFFIRMS the decision of the Commissioner.

The Clerk of Court is respectfully requested to enter judgment accordingly.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge


Dated: March 31, 2016
        Brooklyn, New York